IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § § § | |
| v. | § § | EP-19-CR-1506-PRM |
| ANTONIO ARROYO JR., Defendant. | § § § | |

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

On this day, the Court considered Defendant Antonio Arroyo Jr.'s [hereinafter "Defendant"] "Motion to Suppress Oral and Written Statements of Defendant" (ECF No. 32) [hereinafter "Motion"], filed on July 22, 2019, and the Government's "Response to Motion to Suppress Oral and Written Statements of Defendant" (ECF No. 58) [hereinafter "Response"], filed on August 15, 2019, in the above-captioned cause. Defendant argues that the evidence obtained at various points during a custodial interrogation should be suppressed because they were the result of violations against his Fifth and Fourteenth Amendment rights. Mot. 3; *see* U.S. CONST. amends. V, XIV. Additionally, Defendant requests an evidentiary hearing. *Id.* The Government provided an audiovisual recording to the Court, which clearly depicts all events at issue in this

matter. Resp. Ex. 1, Video Recording of Def.'s Custodial Interrogation, May 22, 2019, ECF No. 51-1 [hereinafter "Video Ex."]. Accordingly, the Court concludes that no evidentiary hearing is necessary. After due consideration, the Court is of the opinion that Defendant's Motion should be denied for the following reasons.

## I. FACTUAL BACKGROUND

On May 15, 2019, a Grand Jury issued a two-count indictment charging Defendant with Coercion and Enticement of a Minor, in violation of 18 U.S.C. § 2422(b), and Travel with Intent to Engage in Illicit Sexual Conduct, in violation of 18 U.S.C. § 2423(b). Indictment 1–2. On May 16, 2019, a bench warrant was issued for Defendant's arrest, (ECF No. 8), and in the late-afternoon of May 22, 2019, federal law enforcement officers arrested Defendant while he was at work. Mot. 2; Resp. 1. The arresting officers transported Defendant to the Federal Bureau of Investigation's [hereinafter "FBI"] El Paso office located at the El Paso Federal Justice Center, in El Paso, Texas [hereinafter "EPFJC"]. Mot 2; Resp. 1. Shortly after 6:00 p.m. Mountain Time, Defendant was brought to an interview room at the EPFJC for a custodial interrogation. Mot 2.; Resp. 2. The room included an audiovisual recording device, which taped everything that took place between when Defendant entered the interview room at

6:17 p.m.,[1] and when his custodial interrogation ended at 8:07 p.m.  Mot 2;
Resp. 2; *see* Video Ex.

Two FBI agents conducted the custodial interrogation, and both
were present for all stages of questioning.  Video Ex.  The room was well
lit, with chairs for Defendant and both FBI agents, a table, a desk, and
decorative plants.  *Id.*  After Defendant entered the room, one FBI agent
offered him water and the opportunity to use the restroom.  *Id.* at 6:19:45
p.m.  Defendant received water immediately, *id.* at 6:24:50 p.m., and
visited the restroom during the custodial interrogation, *id.* at 7:28:00.
One FBI agent removed Defendant's handcuffs, *id.* at 6:20:25 p.m., and
Defendant remained unrestrained for all stages of questioning, *id.*

Before any questioning commenced, the FBI agents informed
Defendant of his right to remain silent pursuant to *Miranda v. Arizona*,
384 U.S. 436 (1966), both orally and in writing.  Video Ex. at 6:23:26–
26:38 p.m.  At one FBI agent's instruction, Defendant read aloud the last
section from the written *Miranda* warning, stating that "I have read the
statement of my rights and I understand what my rights are.  At this

---

[1] All times included in this Order refer to the timestamps found in the
Video Exhibit.  The Court will refrain from making a factual
determination as to whether each video timestamp accurately reflects the
actual time of day.

time, I am willing to answer questions without a lawyer present." *Id.* at 6:26:20–27 p.m. Defendant then signed the written *Miranda* warning. *Id.* at 6:26:38 p.m.; *see* Resp. Ex. 2, Advice of Rights, May 22, 2019, ECF No. 58-2.

At the start of questioning, Defendant answered freely, at times laughing with the FBI agents. Video Ex. This went on for approximately forty-five minutes. *Id.* Defendant calmly refused to answer certain questions but continued on to the next question without any attempt to end the custodial interrogation. *See id.* at 6:36:30, 40:55 p.m. Defendant exhibited momentary signs of emotion, *see id.* at 6:45:30 p.m., but overall, he continued to cooperate and appeared in control of his emotions. Eventually, Defendant's mood changed, and he began giving verbal and physical indications of distress almost an hour into the custodial interrogation.[2] *See id.* at 7:13:55 p.m.

Defendant started to cry and breathe heavily, recounting that he had experienced "thoughts of suicide" in the past. *Id.* at 7:14:00–16:00

---

[2] This change is noticeable. Defendant sat back in his chair and began to cry. His facial expressions changed from relaxed cooperation to immense sadness. Defendant began to volunteer information about his mental condition and openly expressed his emotions in a way that he had not for the first phase of the interview. The mood in the interrogation room clearly shifted.

p.m. He also appeared to consider the potential consequences of a conviction, claiming that he would die in prison if he did "some serious time" and that he hoped he would die. *Id.* When the FBI agents suggested that cooperating and serving a sentence might provide Defendant with some form of redemption, Defendant said that he believed "what [he] did was evil man . . . there ain't no redemption for people like [him]." *Id.* at 7:14:00–16:00 p.m. Then, he said that he "would rather be honest," that "the best thing you can do is be honest," and that he was "ready to accept [his] consequences." *Id.* at 7:16:00–7:17:10 p.m.

Thereafter, Defendant consented orally and in writing to allow the FBI agents to search his cell phone. *Id.* at 7:23:00, 25:30 p.m.; *see* Resp. Ex. 3, Consent to Search, May 22, 2019, ECF No. 58-3 [hereinafter "Consent Form"]. One FBI agent asked Defendant for the necessary information to complete the Consent Form, which Defendant provided. *Id.* at 7:23:00–40 p.m. When asked, Defendant informed the FBI agents of messages from an undisclosed individual, but did not mention if there was anything incriminating on the phone. *Id.* The FBI agents did not orally explain to Defendant that he had the right to refuse to give consent before he signed the Consent Form, though the form included language

5

that Defendant had "been advised of [his] right to refuse consent." *Id.*;
Consent Form 1.

Additionally, Defendant agreed to write a letter to the alleged victim
at the FBI agents' suggestion. *Id.* at 7:20:45–23:00. Immediately, the FBI
agents offered to take a break and asked Defendant if he wanted any food.
*Id.* at 7:23:00–23:15 p.m. Defendant visited the restroom but declined
food. *Id.* Once Defendant returned, he wrote the letter to the alleged
victim for twenty minutes, in tears and taking frequent pauses. *Id.* at
7:31:15–50:30; *see* Resp. Ex. 4, Letter, May 22, 2019, ECF No. 58-4.
Defendant continued to say multiple times that he had contemplated
suicide in the past or anticipated committing suicide in the future.[3] *See*
*id.* at 7:45:48, 47:55, 8:02:45 p.m. On one occasion, the FBI agents asked
if Defendant would like to stop writing. *Id.* at 7:48:09 p.m. Although the
FBI agents allowed Defendant time to compose himself, Defendant, at not
time, refused to continue with the interrogation and completed the

---

[3] Defendant mentions an undisclosed individual with whom Defendant
had allegedly shared his past suicidal thoughts. Video Ex. at 7:45:00–
48:00 p.m. Thereafter, Defendant lamented that people would think
negatively of him as a future consequence of his actions, which would
"make [him] want to kill [him]self more." *Id.* Near the end of the
custodial interrogation, Defendant disclosed that he owned a handgun
and would put it up against his head. *Id.* at 8:02:45 p.m.

apology letter and answered the FBI agents' final questions. *See id.*

8:07:37 p.m. (video timestamp displayed when custodial interrogation

ends).

## II.  LEGAL STANDARD

Defendant seeks to exclude all evidence obtained through three

separate instances during the custodial interrogation:  (1) oral statements

made after his "will was overborne as evidenced by his mental, emotional

and physical breakdown, and his suicidal ideation,"[4] (2) his consent to

search his cell phone, and (3) the apology letter he wrote to the alleged

victim.  Mot. 2.  The Court is mindful that Defendant only references the

Fifth and Fourteenth Amendments on the face of his Motion.  Mot. 3.

However, the Court construes Defendant's arguments regarding consent

to search his cell phone as a Fourth Amendment issue, that is, whether

Defendant voluntarily consented such that law enforcement could conduct

a warrantless search of his phone pursuant to the "consent to search"

exception.[5]  *See* U.S. CONST. amend. IV; *United States v. Garcia*, 496 F.2d

---

[4] Defendant does not identify a specific timestamp on the video where his
"will was overborne."

[5] Defendant's argument reads in full:  "That said Defendant was deprived
of his right to counsel and did not intelligently, understandingly or
knowingly waive his consent to search once his will was overborne."

670, 673 (5th Cir. 1974) ("It is well established that a search conducted pursuant to consent is excepted from the requirements of both probable cause and a warrant." (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973))). Accordingly, the Court considers Defendant's challenge to his consent to search through the appropriate Fourth Amendment standards, while continuing to consider Defendant's challenges to his oral statements and the apology letter pursuant to the Fifth Amendment.

## A.    Fifth Amendment

The Fifth Amendment to the United States Constitution guarantees that no individual "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. In *Miranda v. Arizona*, the Supreme Court "established that the prosecution may not use statements stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the

---

Courts are undecided on the relationship between *Miranda* and consensual searches. *See* 4 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 8.2(j) (5th ed. 2012). Fifth Circuit precedent suggests that whether a defendant consents to a search is a separate inquiry from whether a defendant has waived their *Miranda* rights. *See United States v. Broussard*, 80 F.3d 1025, 1035–36 (5th Cir. 1996) (considering a defendant's *Miranda* waiver as indicative of voluntarily consenting to a search, not as sufficient proof of voluntary consent). Therefore, it would be inappropriate for the Court to consider Defendant's *Miranda* waiver and consent to search as one in the same.

privilege against self-incrimination." *United States v. Bennett*, 626 F.2d 1309, 1311 (5th Cir. 1980) (citing *Miranda v. Arizona*, 384 U.S. 436 (1966)). "The safeguards of *Miranda v. Arizona* . . . are well-established," *United States v. Payne*, 954 F.2d 199, 201 (4th Cir. 1992), and include "the now famous *Miranda* rights," *Bennett*, 626 F.2d at 1311. "In order to use an in-custody statement against a defendant, the government must demonstrate that the defendant was warned of his right to remain silent and his right to consult with an attorney." *United States v. Anderson*, 755 F.3d 782, 790 (5th Cir. 2014) (citing *Miranda*, 384 U.S. at 471).

"The government bears the burden of proving by a preponderance of the evidence that both the waiver of *Miranda* rights and the confession were voluntary." *United States v. Raymer*, 876 F.2d 383, 386 (5th Cir. 1989) (citing *Colorado v. Connelly*, 479 U.S. 157, 168–69 (1986)). Courts consider the totality of the circumstances to determine whether the defendant acted voluntarily such that "'the statement is the product of the accused's free and rational choice.'" *United States v. Bell*, 367 F.3d 452, 461 (5th Cir. 2004) (quoting *United States v. Broussard*, 80 F.3d 1025, 1033 (5th Cir. 1996)). A statement is involuntary when it "result[s] from coercive police conduct," *id.* (citing *Connelly*, 479 U.S. at 163–65), and "deprives the defendant of knowledge essential to his ability to

9

understand the nature of his rights and the consequences of abandoning them," *id.* (citing *Soffar v. Cockrell*, 300 F.3d 588, 596 (5th Cir. 2002) (en banc)).

Voluntariness is defined through "the presence or absence of police coercion" and a statement may only be involuntary if there is "an element of official overreach[]." *Raymer*, 876 F.3d at 386–87 (citation omitted); *see also United States v. Blake*, 481 Fed. Appx. 961, 962 (5th Cir. 2012) ("Coercive police conduct is a necessary prerequisite to the conclusion that a confession was involuntary." (citing *Connelly*, 479 U.S. at 163–67)). A defendant's mental condition alone is not enough to determine voluntariness. *Raymer*, 876 F.3d at 386–87 (citing *Connelly*, 479 U.S. 157). Instead, Courts must ask whether there was "[p]olice exploitation of the mental condition." *Id.* (citing *Connelly*, 479 U.S. at 164–65). Courts focus on law enforcement action because "the Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'" *Connelly*, 479 U.S. at 170 (quoting *Oregon v. Elstad*, 470 U.S. 298, 305 (1985)). Thus, the Court's inquiry should be limited to the FBI agents' actions during the custodial interrogation and whether they were calculated to exploit Defendant's perceivable mental condition, not Defendant's claims of past,

or possibly future, suicidal thoughts themselves.

Expressions relating to the continuation of life must never be taken lightly. Today, the Court is required to accept Defendant's statements on their face, and divine objective meaning from the words he has chosen and the context in which his emotions manifested during the custodial interrogation. There is a fine distinction between comments about past and future thoughts, and comments about thoughts in the present. A person's reflections on entertaining suicidal thoughts in the past are not an indication of a desire to end life presently. Similarly, an expression of concern that one might commit suicide in response to a possible outcome of one's case is not a statement of one's current mental condition. The Court is of the opinion that it is impossible to know a thought that is not explicitly shared. Therefore, the Court must set aside sympathy for Defendant's plight, and consider his words as they are spoken, not as they may be possibly construed.

**Fourth Amendment**

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. The Supreme Court has determined that warrantless

searches and seizures are per se unreasonable unless they fall within a few narrowly defined exceptions. *United States v. Cardenas*, 9 F.3d 1139, 1147 (5th Cir. 1993) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55 (1971)). In addition, "a warrant is generally required before [a search of data on a cell phone], even when a cell phone is seized incident to arrest." *Riley v. California*, 134 S. Ct. 2473, 2493 (2014). "[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir. 2010) (quoting *Schneckloth*, 412 U.S. at 219).

"When courts review a search justified by consent, there are four distinct issues." *United States v. Freeman*, 482 F.3d 829, 831 (5th Cir. 2007). "First, as a threshold matter, the government must demonstrate that the defendant did consent," a determination that is "based on the totality of circumstances." *Id.* at 831–32 (citing *United States v. Price*, 54 F.3d 342, 345–46 (7th Cir. 1995)). Second, if the government is successful in demonstrating consent, the Government must next demonstrate that the defendant consented voluntarily. *Id.* at 832 (citing *Schneckloth*, 412 U.S. at 222). Third and fourth, the government must show that "the search was within the scope of consent" and that "the consenting

individual had authority to consent."[6] *Id.* (first citing *United States v. Ibarra*, 965 F.2d 1354, 1356 n.2 (5th Cir. 1992); then citing *United States v. Matlock*, 415 U.S. 164, 169–71 (1974); and then citing *Illinois v. Rodriguez*, 497 U.S. 177, 183–89 (1990)).

The first, third, and fourth factors are not at issue in this case. Defendant orally and in writing consented to the search of his cell phone, satisfying the first factor. Additionally, the signed Consent Form clearly identified the cell phone and included the language "I authorize these agents to take any items which they determine may be related to their investigation." Resp. Ex. 3. Because there are no facts alleging that the search extended outside of the scope of this language, the third factor is not at issue. Lastly, both parties agree that Defendant had the authority to consent as owner of the cell phone, satisfying the fourth factor. Therefore, the Court will limit its analysis to the second factor.

"[T]he question [of] whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the

---

[6] "Unlike the first two issues, scope and authority are not determined based on a totality-of-the-circumstances standard, but by a reasonable-officer standard." *Freeman*, 482 F.3d at 832.

circumstances." *Schneckloth*, 412 U.S. at 227. Courts in the Fifth Circuit use a six-factor test to assess voluntariness, examining:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*Freeman*, 482 F.3d at 832–33 (citing *United States v. Kelley*, 981 F.2d 1464, 1470 (5th Cir. 1993)). "All six factors are relevant, but no single one is dispositive or controlling." *Id.* "The government has the burden of proving, by a preponderance of the evidence, that the consent was voluntary." *Kelley*, 981 F.2d at 1470 (citing *United States v. Yeagin*, 927 F.2d 798, 800 (5th Cir. 1991)).

## III. ANALYSIS

Given the chronological nature of Defendant's challenges to his custodial interrogation, the Court will initially assess his claims through the Fifth Amendment, and then consider the Fourth Amendment claim. First, the Court will analyze whether Defendant's statements to the FBI agents and letter to the alleged victim were voluntary. Next, the Court will consider whether Defendant voluntarily consented to the search of his cell phone. For the reasons discussed below, the Court concludes that

(1) Defendant voluntarily waived his right to counsel pursuant to *Miranda*, and that the FBI agents' actions were not coercive which would render Defendant's subsequent statements and apology letter involuntary; and (2) that Defendant's consent to search the cell phone was voluntary.

Accordingly, after due consideration, the Court is of the opinion that the FBI agents did not violate Defendant's Fifth or Fourth Amendment rights during his custodial interrogation, and none of the evidence obtained as a result of the custodial interrogation should be excluded.

## A.   Fifth Amendment

First, the Court considers whether Defendant's statements to the FBI agents and letter to the alleged victim were voluntary. Defendant does not provide a specific video timestamp identifying those portions of the custodial interrogation upon which his Motion relies. Thus, the Court's analysis will cover the entire length of the custodial interrogation. Defendant refers to a vague moment where his "will was overborne as evidenced by his mental, emotional and physical breakdown, and suicidal ideation during the latter stage of the FBI interrogation." Mot. 2. Having reviewed the video, the Court presumes that at the very earliest, this evidence noticeably manifested itself at the 7:13:55 p.m. video timestamp when Defendant first exhibited evidence of emotional distress and

physical distress, or made statements relating to suicide. Video Ex.

Accordingly, the Court will assess voluntariness in two stages; those

statements made before the 7:13:55 p.m. video timestamp, and those

made thereafter. Additionally, the Court will begin with an analysis of

Defendant's *Miranda* waiver.

### 1.   *Miranda* Waiver

Defendant's Motion is silent on whether his initial *Miranda* waiver

was involuntary. The video recording shows that FBI agents informed

Defendant of his *Miranda* rights prior to any questioning, both orally and

in writing. Defendant acknowledged that he understood these rights,

read a statement of consent, and signed a written waiver form.

Furthermore, there is no evidence that the FBI agents' actions or

Defendant's environment coerced him to waive his right to an attorney at

this stage in the custodial interrogation. The FBI agents did not pressure

Defendant in any way, and Defendant appeared comfortable in the

audiovisual recording. He had a relaxed demeanor, was not handcuffed,

and participated in casual conversation with the FBI agents before

signing the waiver. The Court concludes that there is no evidence that

the FBI agents used "sophisticated modes of persuasion" rising to the

level of coercion. *See* Mot. 1–2 (citing *Blackburn v. Alabama*, 361 U.S.

199, 206). Considering the totality of the circumstances, Defendant acted voluntarily when he waived his *Miranda* rights and agreed to answer questions without an attorney present.

Assuming, *arguendo*, that Defendant's statements relating to suicide had some impact on his choice to waive his *Miranda* rights, the lack of any evidence of coercion precludes an argument for involuntariness. One might imagine a situation where a defendant's suicidal ideation was so extreme as to impact their ability to "understand the nature of [their] rights and the consequences of abandoning them." *See Bell*, F.3d at 461. Critical to this case, Defendant did not make his past, or fears of potential future, suicidal ideation known until almost an hour into the custodial interrogation. The Fifth Circuit has held that a defendant's mental condition alone is insufficient to prove involuntariness, rather there must be proof that law enforcement exploited the mental condition. *See Raymer*, 876 F.3d at 386–87. There is no evidence that Defendant's mental condition noticeably manifested itself before the 7:13:55 p.m. video timestamp, or that the FBI agents were informed of Defendant's mental condition through other means. Therefore, the FBI agents could not have exploited a mental condition of which they were unaware. Accordingly,

Defendant's *Miranda* waiver was voluntary pursuant to the Fifth
Amendment.

### 2. Oral Statements Made Before Noticeable Manifestation of Defendant's Mental Condition

Having concluded that Defendant's initial *Miranda* waiver was
voluntary, the Court next considers Defendant's statements made
between the waiver and the 7:13:55 p.m. video timestamp. The video
recording shows that Defendant's demeanor and cooperation with the FBI
agents is consistent with the circumstances of his initial *Miranda* waiver.
The FBI agents calmly asked Defendant questions while seated at a
distance. Defendant calmly answered these questions in detail, with no
indication that he was under stress or the subject of coercion. On two
occasions, Defendant exercised his right to remain silent and refused to
answer a specific question before voluntarily moving on to the next one.
Accordingly, the Court is of the opinion that Defendant's statements made
before the 7:13:55 p.m. video timestamp were voluntary pursuant to the
Fifth Amendment, and should not be excluded.

### 3. Oral Statements and Apology Letter Made After Noticeable Manifestation of Defendant's Mental Condition

Lastly, the Court considers Defendant's oral statements and apology letter to the alleged victim made after the 7:13:55 p.m. video timestamp. Defendant alleges that he made these statements and wrote his apology letter in a heightened emotional state after making his statements relating to suicide known to the FBI agents. As articulated above, the Court must inquire into the FBI agents' response to Defendant's perceived mental condition, not his subjective mental condition itself. The totality of the circumstances suggest that the FBI agents did not exploit Defendant's mental condition to rise to the level of coercion.

When Defendant's emotional state changed at the 7:13:55 p.m. video timestamp, Defendant informed FBI agents that he had not only harbored suicidal thoughts but was also willing to "be honest" and "accept [his] consequences." In response, one FBI agent suggested Defendant write an apology letter to the alleged victim, a custodial interrogation tactic that the Court presumes is not infrequent. *See Montejo v. Louisiana*, 556 U.S. 778 (2009) (considering an inculpatory apology letter written during an interrogation). Defendant asked to write the apology letter shortly thereafter, which immediately prompted the FBI agents to suggest a

break in the custodial interrogation. This break began at the 7:23:00 p.m. video timestamp and lasted until the 7:31:15 p.m. video timestamp. Defendant then returned to the interrogation room and began writing the apology letter with a pen and paper that the FBI agents had left for him on the desk in the interrogation room. The FBI agents remained seated away from the Defendant and mostly silent as Defendant wrote the apology letter. When the FBI agents responded to Defendant's comments relating to suicide, they did so supportively, using positive language and offering Defendant the opportunity to stop writing. Furthermore, Defendant never attempted to stop writing and completed the apology letter on his own accord.

While arguably possible that the FBI agents' positive rapport with Defendant was a custodial interrogation tactic to make Defendant amenable to continuing to cooperate, the Court concludes it does not rise to the level of coercion that requires exclusion of the evidence. Thus, Defendant voluntarily wrote the apology letter to the alleged victim, and it should not be excluded as a violation of his Fifth Amendment rights. Additionally, the lack of coercion indicates all oral statements made after the 7:13:55 p.m. timestamp were also voluntary and should not be excluded.

The Court is mindful that Defendant never took any action indicating that he was no longer willing to cooperate. He did not ask for a lawyer when he received his *Miranda* warning. He never tried to stop the interview to ask for a lawyer. He never said that the interview was over or that he was not going to answer additional questions. His actions are entirely consistent with a cooperative suspect, and the Court is of the opinion that there is no evidence that the FBI agents violated Defendant's Fifth Amendment rights during the custodial interrogation.

## B.    Fourth Amendment

Next, the Court will consider the voluntariness of Defendant's consent to search his cell phone. As articulated above, courts use a six-factor test to assess voluntariness, examining:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*Freeman*, 482 F.3d at 832–33 (citing *Kelley*, 981 F.2d at 1470). "All six factors are relevant, no single factor is dispositive." *United States v. Shabazz*, 993 F.2d 431, 438 (5th Cir. 1993). After due consideration, the

Court is of the opinion that these factors indicate Defendant consented voluntarily to the search.

First, the Court recognizes that Defendant was under arrest such that his custodial status was involuntary. This factor weighs towards involuntariness.

Second, though the FBI agents did not coerce Defendant to incriminate himself during the custodial interrogation, courts have found that coercive police procedures may include an officer's conduct that can be described as a command or direction rather than a request for consent. *United States v. Zavala*, 459 F. App'x 429, 433 (5th Cir. 2012) (holding there were coercive procedures when defendant followed officer to a checkpoint where defendant's vehicle was subject to a canine sniff after officer stated, "I'm going to go ahead and take you to the checkpoint, sir," which the court determined could "more accurately be described as directions to follow rather than request for consent to follow"); *United States v. Drayton*, 536 U.S. 194, 206 (2002) (finding consent to search was voluntary when "[n]othing [the officer] said indicated a command to consent to the search.").

The audiovisual recording depicts the entire exchange. Video Ex. at 7:23:40–25:48 p.m. One of the FBI agents told Defendant that he was

going to fill out the Consent Form. He asked Defendant for the model of Defendant's cell phone and whether it had a password, which Defendant provided. He then handed Defendant the Consent Form and told him where to sign it. This language is more consistent with a command or direction than with a request for consent. Thus, this factor also weighs toward involuntariness, though the Court considers this in the totality of the circumstances and maintains its determination that the FBI agents did not act coercively throughout the custodial interrogation.

Third, Defendant fully cooperated with the FBI agents leading up to their request for his consent to search. A defendant's consent to search may be voluntary if their actions are "consistent with the rest of [the defendant's] behavior that night." *United States v. Martinez*, 410 F. App'x 759, 764 (5th Cir. 2011). Defendant had waived his *Miranda* rights and answered nearly every question the FBI agents asked him for almost an hour. Furthermore, he provided the FBI agents with the information necessary to fill out the Consent Form, and freely signed it in the same manner that he freely answered questions earlier in the custodial interrogation. Therefore, this factor weighs heavily in favor of voluntariness.

Fourth, it is unclear whether Defendant was aware of his right not to consent to the search. As explained above, the FBI agent who gave Defendant the Consent Form did so in the form of a command or direction, without explaining that Defendant had the right to refuse consent. Simultaneously, the Consent Form included the language, "I have been advised of my right to refuse consent." The lack of an oral explanation is not dispositive of a failure to advise a defendant of their rights when the advisory is included in a consent to search form. *See Shabazz*, 993 F.2d at 438–39 (affirming a finding of voluntariness when there was no evidence that the defendant had not read the consent form before signing it). Given this inconsistency, the Court concludes that this factor is in equipoise and weighs neither for nor against voluntariness.

Fifth, there is no evidence that Defendant's education or intelligence hindered his ability to consent. Defendant can speak and write English fluently, was articulate in his answers to the FBI agents, and did not give any indication that he was of anything less than at least average intelligence. At one point during the custodial interrogation he indicates that he attended high school, suggesting at least an eighth grade level of education. Video Ex. at 6:36:15 p.m. Thus, this factor weighs in favor of voluntariness.

Sixth, Defendant made clear that he did not think there was anything incriminating on his cell phone. Consent is more likely to be voluntary when the defendant did *not* know incriminating evidence would be found and, conversely, involuntary when the defendant knew incriminating evidence would be found. *See United States v. Ponce*, 8 F.3d 989, 998 (5th Cir. 1993) (holding consent to search was voluntary when the defendant stated, "Dang, I forgot it was there," upon the officer's discovery of heroin in the defendant's watch pocket); *United States v. Sanchez-Mendoza*, No. MO-09-CR-003, 2009 WL 10680137, at *5 (W.D. Tex. Apr. 29, 2009) (holding that the defendant's statement that she was unaware cocaine had been placed in her vehicle "suggests that consent was voluntary because she would not have known that incriminating evidence would be discovered"). In this case, one FBI agent asked Defendant if there was anything on the cell phone of which he should be made aware. Defendant answered that the cell phone may contain messages or photos with an undisclosed individual who Defendant did not identify as the alleged victim. Though given the opportunity, he did not disclose anything else. Thus, this factor weighs in favor of voluntariness.

When considered in the totality, these factors support a determination that Defendant's consent to search was voluntary. The

Court concludes that the third and sixth factors are particularly persuasive. Defendant cooperated completely with the FBI agents from the beginning until the end of the custodial interrogation. He helped the FBI agents fill out the Consent Form and then signed the Consent Form. Furthermore, he gave his consent after freely making numerous self-incriminating statements, and volunteering that it was important to "be honest." Additionally, he told the FBI agents what he believed was on the phone after consenting to the search. These factors substantially outweigh any concerns that Defendant was already under arrest, that the FBI agent commanded or directed Defendant to sign the form, or that it is inconclusive whether Defendant had been informed he had the right to refuse. Accordingly, after due consideration, the Court is of the opinion that Defendant voluntarily consented to the search of his cell phone. Therefore, the FBI agents did not violate Defendant's Fourth Amendment rights and the evidence obtained as a result of the consented search of his cell phone should not be suppressed.

## IV. CONCLUSION

In sum, considering the totality of the circumstances, the Court determines that the Government has met its burden of establishing that Defendant's Fourth and Fifth Amendment rights were not violated during

his custodial interrogation.  Defendant voluntarily waived his right to counsel pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), both orally and in writing, and this voluntariness extended to his subsequent oral statements and the apology letter to the alleged victim.  Additionally, Defendant voluntarily consented to the search of his cell phone.  Lastly, because the FBI agents' governmental actions identified in Defendant's motion did not violate his constitutional rights, the Court must reject Defendant's Fourteenth Amendment argument.  After due consideration, the Court is of the opinion that Defendant's request to suppress the evidence identified in his Motion should be denied.

Accordingly, **IT IS ORDERED** that Defendant Antonio Arroyo Jr.'s "Motion to Suppress Oral and Written Statements of Defendant" (ECF No. 32) is **DENIED**.

SIGNED this 23 day of **September, 2019**.

PHILIP R. MARTINEZ
UNITED STATES DISTRICT JUDGE